SMS/RO/2021R00946

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Kevin McNulty |
| v. | : | Criminal No. 21-841 |
| PAT J. TRUGLIA, a/k/a "PATSY TRUGLIA" | : | 18 U.S.C. § 1349 |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Acting United States Attorney for the District of New Jersey charges:

1. Unless otherwise indicated, at all times relevant to this Information:

    a. Defendant PAT J. TRUGLIA, a/k/a "PATSY TRUGLIA," ("defendant TRUGLIA") was a resident of Florida. Defendant TRUGLIA owned, operated, and had a financial interest in various entities located in Florida (the "TRUGLIA Supply Companies") through which defendant TRUGLIA obtained doctors' orders for orthotic braces (also called "durable medical equipment" or "DME") (hereinafter referred to as "DME Orders").

    b. Aaron Williamsky ("WILLIAMSKY") and Nadia Levit ("LEVIT"), co-conspirators not charged in this Information, were each residents of New Jersey who owned, operated, and had financial and controlling interests in numerous DME supply companies located in New Jersey and elsewhere (collectively, the "WILLIAMSKY/LEVIT DME Companies"). The WILLIAMSKY/LEVIT DME Companies primarily supplied DME such as knee,

ankle, back, wrist, and shoulder braces to beneficiaries of both federally-funded and privately-funded health care benefit programs.

c. DME Company-1 was a DME supply company located in Georgia and owned by defendant TRUGLIA, WILLIAMSKY, and LEVIT.

d. Thomas Farese ("FARESE"), a co-conspirator not charged in this Information, was a resident of Florida. Together with WILLIAMSKY and LEVIT, defendant TRUGLIA and FARESE owned and had a financial interest in DME Company-2, a DME supply company located in Florida.

**The Medicare Program**

e. Medicare was a federally-funded program established by the Social Security Act of 1965 (codified as amended in various sections of Title 42, United States Code) to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualify under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries."

f. Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

g. Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

h. Medicare Part B covered non-institutional care that included physician services and supplies, such as DME, that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

i. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

j. In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

k. As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the Federal anti-kickback statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by

3

Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

l. Medicare-authorized suppliers of healthcare services, such as DMEPOS suppliers, could only submit claims to Medicare for reasonable and medically necessary services. Medicare would not reimburse claims for services that it knew were procured through kickbacks or bribes. Medicare would not reimburse for services that were not medically necessary, procured through the payment of kickbacks and bribes, and not provided as represented. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for those elderly and other qualifying beneficiaries who had a genuine need for medical services.

**TRICARE**

m. TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering TRICARE.

n. TRICARE was a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affected commerce.

## CHAMPVA

o.   The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

p.   In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims had to have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

q.   CHAMPVA was a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affected commerce.

## The Conspiracy

2. From in or around October 2017, and continuing through in or around April 2019, in the District of New Jersey, and elsewhere, defendant

**PAT J. TRUGLIA,**
**a/k/a "PATSY TRUGLIA,"**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, that is Medicare, TRICARE, CHAMPVA, and others and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, said health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

## Goal of the Conspiracy

3. The goal of the conspiracy was for defendant TRUGLIA and his co-conspirators to unlawfully enrich themselves and others by causing the submission of false and fraudulent claims to health care benefit programs.

## Manner and Means of the Conspiracy

4. It was a part of the conspiracy that:

   a. In or around October 2017, defendant TRUGLIA and WILLIAMSKY agreed that defendant TRUGLIA would procure DME Orders for the WILLIAMSKY/LEVIT DME Companies, and that TRUGLIA would be paid approximately $300 for each DME Order for a back brace, $200 for each DME

6

Order for a knee or shoulder brace, and $100 for each DME Order for a wrist or ankle brace. Shortly thereafter, defendant TRUGLIA began to provide DME Orders to WILLIAMSKY/LEVIT DME Companies in exchange for kickbacks. The WILLIAMSKY/LEVIT DME Companies then billed Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs for the DME Orders that they had obtained in exchange for kickbacks.

   b. Defendant TRUGLIA was able to procure DME Orders through his access to telemarking and telemedicine companies. To generate DME Orders, defendant TRUGLIA and his co-conspirators first identified qualified beneficiaries located in New Jersey and elsewhere through the use of marketing call centers under their direction. Once beneficiaries were identified by the marketers, the TRUGLIA Supply Companies utilized the services of telemedicine companies to secure DME Orders, regardless of whether the prescriptions were medically justified for the beneficiaries.

   c. The DME Orders procured by the TRUGLIA Supply Companies were also the product of kickback arrangements. Specifically, defendant TRUGLIA and his co-conspirators entered into kickback arrangements with telemedicine companies to use the doctors and nurse practitioners employed by those companies to write DME Orders. Defendant TRUGLIA agreed to pay the telemedicine companies kickbacks for each DME Order that the telemedicine companies provided for those beneficiaries. The

7

telemedicine companies, in turn, arranged to the pay healthcare providers under their control per consultation that resulted in a DME Order.

        d.    For example, defendant TRUGLIA entered into a kickback arrangement with Lester Stockett ("STOCKETT"), a co-conspirator not charged in this Information, who owned, operated, and had a financial interest in a telemedicine company, Telemed Health Group, LLC ("THG"). THG, among other things, hired doctors and nurse practitioners who were enrolled in Medicare as health care providers and could therefore write DME Orders that would be reimbursed by Medicare. Defendant TRUGLIA agreed to pay STOCKETT approximately $90 for each DME Order that STOCKETT provided to defendant TRUGLIA. STOCKETT, in turn, arranged to pay healthcare providers under his control approximately $30 per consultation that resulted in a DME Order. Defendant TRUGLIA paid THG in excess of approximately $1.2 million for DME Orders.

        e.    To conceal and disguise the scheme, defendant TRUGLIA, STOCKETT, and others entered into sham contracts labeling payments for the purchasing of completed doctors' orders as "marketing" or "business process outsourcing" (BPO) expenditures, creating false and fraudulent invoices, and by using shell companies and bank accounts to obscure the payments to THG. To reinforce the appearance that defendant TRUGLIA was paying for BPO Services rather than DME Orders, STOCKETT caused invoices to be emailed to defendant TRUGLIA purporting to charge $25 per hour for BPO Services. The emails attaching the invoices, however, clarified that the BPO hours were "the fair

market value equivalent" of "consults" at a rate of four fake BPO hours for one consult. Thus, the invoices fraudulently made it appear that defendant TRUGLIA paid for four hours of BPO services at $25 each, in order to disguise that defendant TRUGLIA was paying an illegal kickback of approximately $100 for each doctor's consultation.

    f.    After obtaining DME Orders, defendant TRUGLIA transmitted and caused to be transmitted the DME Orders to the WILLIAMSKY/LEVIT DME Companies for processing, which in turn billed Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs. Defendant TRUGLIA (through the TRUGLIA Supply Companies) was paid a kickback for each DME Order that resulted in reimbursement from a paying health care benefit program.

    g.    To account for those DME Orders for which he expected to be paid a kickback, defendant TRUGLIA sent written messages to WILLIAMSKY and LEVIT outlining the payments owed to him.

    h.    In this manner, defendant TRUGLIA submitted and caused the submission of claims to Medicare, TRICARE, CHAMPVA, and other health care benefit programs for DME Orders that were (i) medically unnecessary; (ii) obtained through the payments of kickbacks and bribes and therefore not eligible for federal reimbursement; and (iii) not provided as represented.

    i.    In or around early 2018, defendant TRUGLIA and WILLIAMSKY agreed that defendant TRUGLIA would purchase an ownership interest in DME Company-1, one of the WILLIAMSKY/LEVIT DME Companies. In lieu of a cash investment, defendant TRUGLIA agreed to provide WILLIAMSKY

9

and LEVIT with approximately $200,000 worth of DME Orders in exchange for an ownership interest in DME Company-1. DME Company-1 was a registered DMEPOS supplier with Medicare. Although the Form CMS-855S that was submitted to Medicare on behalf of DME Company-1 listed Nominee Owner-1 as its owner, in reality, defendant TRUGLIA, WILLIAMSKY, and LEVIT, owned and operated DME Company-1 outside of the knowledge of Medicare.

j.   Like the other WILLIAMSKY/LEVIT DME Companies, DME Company-1 received DME Orders from defendant TRUGLIA and others pursuant to kickback arrangements. As a result of the scheme, Medicare, TRICARE, and CHAMPVA paid DME Company-1 at least approximately $5,896,428 in reimbursements for fraudulent DME Orders.

k.   In addition to receiving kickback payments for supplying DME Orders to the WILLIAMSKY/LEVIT DME Companies, defendant TRUGLIA received distributions of proceeds from DME Company-1 due to his ownership stake. For example, from between in or around April 2018 and April 2019 defendant TRUGLIA received approximately $900,000 in fraudulently obtained profits from DME Company-1.

l.   In or around May 2018, defendant TRUGLIA, WILLIAMSKY, and FARESE agreed that defendant TRUGLIA and FARESE would purchase an ownership interest in DME Company-2, one of the WILLIAMSKY/LEVIT DME

Companies. Thereafter, in or around June 2018, defendant TRUGLIA and FARESE invested approximately $500,000 into DME Company-2.

m. To evade detection, defendant TRUGLIA, FARESE, WILLIAMSKY, and LEVIT concealed from Medicare their ownership, financial, and controlling interests in DME Company-2 by falsely reporting Nominee Owner-2 on the Form CMS-855S while omitting their own names. Defendant TRUGLIA and his co-conspirators provided Nominee Owner-2 with a monthly cash payment of approximately $10,000 in exchange for serving as the nominee owner.

n. Like the other WILLIAMSKY/LEVIT DME Companies, DME Company-2 received DME Orders from defendant TRUGLIA and others pursuant to kickback arrangements. As a result of the scheme, from in or around June 2018 through in or around April 2019, Medicare, TRICARE, and CHAMPVA paid DME Company-2 approximately $2,869,751 in reimbursements for fraudulent DME Orders. From between in or around August 2018 and April 2019, defendant TRUGLIA and FARESE received a total of approximately $730,000 in profits from DME Company-2's fraudulent billings.

o. From in or around October 2017 through in or around April 2019, defendant TRUGLIA received kickbacks from the WILLIAMSKY/LEVIT DME Companies of approximately $7,693,925 for DME Orders. As a result of the kickback scheme, the WILLIAMSKY/LEVIT DME Companies billed Medicare, TRICARE, and CHAMPVA approximately

11

$58,000,000 and were reimbursed approximately $32,000,000 for the DME Orders that were procured by defendant TRUGLIA and his co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1. Upon conviction of the offense alleged in the Information, defendant TRUGLIA shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offense (as defined in 18 U.S.C. § 24) alleged in this Information, including, but not limited to, a sum of money equal to $9,477,925.

## SUBSTITUTE ASSETS PROVISION
## (Applicable to All Forfeiture Allegations)

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

RACHAEL A. HONIG
Acting United States Attorney

*/s/ Joseph S. Beemsterboer*

JOSEPH S. BEEMSTERBOER
Acting Chief, Criminal Division,
Fraud Section